The fourth case today is number 22-1354 United States v. Carlos Ruben Boyrie-Laboy. At this time would counsel for the appellant please introduce himself on evidence that does not satisfy the element of the offense that the reported robbery affected interstate commerce. The Pobst Act requires the government to establish a reasonable probability that the criminal act had some impact on interstate commerce. Here the court has stated in many of the cases cited in our brief that an effect on interstate commerce as required for a Pobst Act conviction may generally be demonstrated by showing that the business engaged in interstate commerce and the robbery either depleted the assets of the business or resulted in the business's temporary or permanent closure. Here the government failed to offer any evidence of a robbery's effect on interstate commerce. There was no evidence on record of the individual's finances or anything along those lines. The government has yet to answer to this day what entity engaged in interstate commerce in this alleged conspiracy attempt to rob. Which specific business engaged in interstate commerce was affected by a criminal act here and how was it affected? If the government is presuming that such an entity here was the FBI, I would submit to the court that the FBI is not a business engaged in interstate commerce for purposes of the Pobst Act. And nothing that happened here had an impact on interstate commerce or the FBI's so-called business. In this operation, the FBI purchased pyrotechnics and electronic appliances and used them exactly as it intended when it purchased these goods. The FBI wasn't depleted of assets. It didn't have to shut down operations. And the movement of these goods through interstate commerce wasn't affected in any way. These goods moved through interstate commerce exactly as the FBI intended. Do you want to address the miscarriage of justice standard? Yes, Your Honor. I have to acknowledge upon further review I believe the government is right about the standard of review. And we are left to the court's discretion. It chooses to entertain our arguments. The court can't do so despite the Rule 29 issued before the district court if it does find a clear and gross injustice. And we're hoping that the court will do so here. Regarding our argument about the specific intent required to prove the offenses charged, the government cites testimony that although it sounds incriminating, one can read almost all the pages cited and almost all the testimonies cited by the government. In a way that is perfectly consistent with the behavior of someone who believes that the team is conducting a legitimate law enforcement operation. If we're going to take, for example, in the government's brief, they cite testimony to the effect that Mr. Boehe discussed entering the house, stealing pyrotechnics. This is regarding the December 29 operation. We discussed entering the house, stealing pyrotechnics, money, and then making a person who was guarding the house sign the consent form to make it seem as if the search was legal. If one reads the pages cited by the government, and those are docket entries 315, pages 47 through 50, and 54, if one reads those pages, those can be read, again, in a way that is consistent with someone who honestly believes that he has conducted a legitimate law enforcement operation in those specific pages, for example. Mr. Lee? Yes. But isn't the issue of the standard that we have to interpret the verdict in a way that any reasonable jury could have looked at the facts and concluded differently? In other words, I understand your argument that you could look at it one way or the other way, but when that's the case, then it's really up to the jury, right? And we have to interpret the verdict in the light that's faithful to the jury's conclusion. That is correct, Your Honor. And I understand it's a steep uphill climb for the appellant. I have the degree to point out to the court at least some evidence that is hard to reconcile with the incriminating testimony. And if I may cite some of that and then go to my conclusion and what I believe was the tipping point in this case, some of the evidence in favor of Mr. Boyi included that while others split the property and money taken, Mr. Boyi never took any money or property from the U.S. The government will point out, as to that, that Mr. Boyi didn't do so because he suspected something was amiss or he had misgivings about the transaction. But Mr. Boyi took that stance from the very first intervention before any evidence was presented of him having misgivings about this operation. Mr. Boyi was purposely held out from conversations about splitting the proceeds of the illegal venture, further supporting his contention that he was not part of the others' plan. We cited in our brief Docket Entry 314, the transcript, pages 50, 71, 73, 94, 100, 104, and Docket Entry 315 at pages 130-132, Docket Entry 316 pages 46 and 48-49. Other evidence that Mr. Boyi submits for the court's consideration in support of his contention that he was not part of an agreement to engage in unlawful conduct includes that when the prosecution was trying to establish that there was trust among the perpetrators because they had committed similar acts before, witness Gabriel Maldonado-Martinez did not even mention Boyi as part of the first intervention over which the others allegedly bonded, even though the prosecutor asked specifically about Boyi. I refer the court to Docket Entry 315 at pages 26-27, also that even as to the intervention of December 29, 2016, in which Boyi allegedly took part in the planning, he never mentioned anything or said anything about robbing the house, and he never received money for his participation. Docket Entry 316, pages 36-38, and regarding the June 15, 2017 intervention, it is undisputed that Mr. Boyi had no part in planning this job. For that, I refer the court to 314, pages 40-41, 45, and 96. Lastly, I want to mention that Mr. Boyi had reasons to believe that this was a legitimate operation. Witness Gabriel Maldonado-Martinez called the FBI because he said the operation was part of an investigation of people stealing shipping containers. This is at Docket Entry 314, page 57, Docket Entry 315, pages 133-134, and also other officers who undisputedly had nothing to do with the criminal enterprise were called to pick up the electronics taken in the 2017 job, and they did come to pick up the stolen goods. This is at Docket Entry 314, pages 54-56, Docket Entry 315, pages 127-128. Also, inventory was taken, and the FBI issued a receipt for the items, and the arrested man was taken into a room for questioning. Can I have 30 seconds? Normally, in these types of cases, one has corroborating evidence in the form of audio and video recordings. I implore the court to consider the fact that this was faulty and tainted evidence, that in a case this close may have been the tipping point for the jury. We cited excerpts from the transcript of the trial in which, at times for long stretches, the prosecutor was just reading from the transcripts. The transcripts are not evidence. Thank you. Thank you for your time. Thank you. Thank you, Counsel. Would Counsel for the United States please introduce herself on the record to begin? Good morning, Your Honors. May it please the Court, I'm Mariela Torre for the Parliament. The Court should affirm Mr. Guerrero's convictions because, first, he made his sufficiency claims, and, second, in any event, sufficient evidence supports the jury's guilty verdict. First, Mr. Guerrero affirmed that he made a sufficiency claim. Mr. Guerrero had a known right under oath to him. Moving past that, I mean, you developed the argument about Waverwell in the brief, but can you just address the evidence of interstate commerce connection? Yes, Your Honor. First, my brother also confused this as a substantive offense and a conspiracy to commit a substantive offense. What the government had to show for interstate commerce is a realistic probability that a planned robbery would have had the minimum effect on interstate commerce. And what matters here is the objective of the conspiracy, as this Court in New Glenn recognized. And here, the government provided evidence that the officers planned to rob merchandise and operating cash of a stash house, and the officers believed that that merchandise, in turn, had stolen from shipping containers that then belonged to a large department store. So, a reasonable jury would have easily concluded, based on the evidence presented, that the interstate commerce element had been met in this case. Moving on, unless Your Honor has any other questions about that, I will go ahead and discuss the intent element. Here, as Your Honor recognized, the evaluation here is in what is most favorable to the jury's verdict. And there is a plethora of evidence that the government presented to demonstrate the requisite intent. The government had to show that there was an intent to agree and an intent to commit the offense in question. And here, the government provided Officer Maldonado's testimony, who was present for both of the operations in question. The government also provided recordings, and the jury heard Mr. Boyer's plan for the offenses, and even shared the property after the offense had happened. Just shared the buyer's techniques, and give away his share simply because he didn't like it. Counsel, could you address the defense counsel's argument that the quality of the audio and video recordings was just extremely poor here, and the transcripts weren't evident? So I guess the argument is that shouldn't even be considered in the evidence that the jury looked at in the case efficiency? Yes, Your Honor. The record simply does not support the argument that the recordings were so insufficient or so bad that they had no evidentiary value. In fact, in reading the transcript where the recordings were discussed and where the recordings were played, Mr. Boyer never issued the quality of the recordings at that time or beforehand when he was given the discovery, or even after the fact. Did he ever object at any point to the quality of those recordings? He never objected to the quality of the recordings when they were played in this report. And for purposes of June's act, the translations were also a necessary part of the proceedings. So they were part of the evidence, and that is something that the district court had noted to the jury as well. And to address really quickly some of the claims my brother counsel had made in a reply brief, for example, he had stated that the government had admitted that the audio was not great, but what the government had stated, and that's on page 96, the government had stated that the audio is not great in the courtroom. The government did not say that the audio itself was in bad quality. And then, for example, another example that my brother counsel had pointed to is that there was a screenshot that was shown, and he states in his reply brief that a witness wasn't able to describe what was in the video, but what was shown to the witness was a screenshot of the video. And then the video was played, and then the witness wasn't able to describe who was on the video. And that's on document 316, pages 12 to 14 is that discussion. If Your Honor would like, I can go through the other points too that he had made. I have a quick question for you. Yes. I think the defendant argues at one point that there's no proof that the defendant knew that, at least in terms of the 641 theft charges, that the theft was of government property. And I noticed in your brief that you cite a Seventh Circuit case case. Is there any First Circuit ad resident on the issue that— I'm not aware of the First Circuit case. The Hicks case was from 2021, and it cites nine Sister Circuits there, nine circuits that had held the same name, but I'm not aware of the First Circuit case holding that name. And with regard to my brother counsel's argument that he did not demonstrate the requisite intent because he didn't take any money or property, I would like to briefly point out that that was not an element the government was required to prove at the outset. And also based on evidence, he did not keep any biotechnics simply because he didn't like it. He gave his share away and then went to what we call his client to get the biotechnics he liked. And with regard to the electronics, the jury was free to infer that he didn't keep anything simply because he became suspicious of the operation, not because he thought it was a legitimate operation. For example, when he saw the FBI informant, he said, you again. He said he doesn't smell good. He looked suspiciously around as Officer Montanado testified. And then after he had arrested the FBI informant, he had stated, I hope you're not the Fed or an undercover officer or something. So the jury was free to infer that he didn't keep anything because of the circumstances of what had transpired. And with regard to the 2016-2015 trust building incident, the government briefed that he was part of the other trust building incidents. Mr. Boyer was part of one of the incidents that he himself had planned to go to his client's house and get biotechnics in 2015. That was prior to the operation that took place in 2016. And there was another operation in 2015 as well that he took part of that the government had noted in its brief. Unless the court has any other questions, I will go ahead and briefly conclude then. This court should affirm Mr. Boyer's convictions first because he made his claims. And in any event, there is no clear approach in justice here that would require this court to reverse his convictions. Thank you. Thank you, counsel. There being no rebuttal, that concludes arguments in this fourth case. We're going to take a short break. Counsel for the next case.